Freeman *v.* Thayer.

S. c. 148, § 29; 1839 statutes, c. 412; *Metcalf* v. *Hilton*, 26 Maine, 200; *Harding* v. *Butler*, 21 Maine, 191.

2. The decision in *Harding* v. *Butler*, was made under statute of 1839. The language is the same in the Revised Statutes; and the Court, in the case of *Metcalf* v. *Hilton*, refer to the case of *Harding* v. *Butler*.

3. The evidence of the demands disclosed at the time of trial, being worthless, makes no difference, as they might subsequently become good, and if so, then if appraised and set off, might have been valuable to the plaintiff.

The question arising under the act of August 11, 1848, relates only to the amount of damage.

---

JOSEPH FREEMAN & *als. versus* ASA THAYER, JR. & *al.*

Where the creditor levies upon land to which his judgment debtor had no title, the debtor is not estopped to assert a subsequently acquired title to the same land.

TRESPASS, for taking certain mill logs. The defendants pleaded severally the general issue, and Thayer, one of the defendants, justified the taking by brief statement, as a deputy sheriff, on a writ of attachment, as the property of *Moses Chesley*.

At the trial, before WELLS, J., at the last term of this Court,

it appeared that the logs were cut in the winter of 1848, on lot 95, in Poland, by *Chesley* and hauled by him to Craigie's Mills, where they were attached by the other defendant, and while thus in the custody of Thayer, Chesley rolled them into the pond, and the logs had been sawed.

The plaintiffs, to show their title to the land where the logs were cut, put in a deed of warranty from *Godfrey Grosvenor* to them, dated and acknowledged October 12, 1842, and recorded April 12, 1848, which covered the premises.

It also appeared, that Grosvenor attached said land June 15, 1835, on a writ against said Chesley, and duly levied his execution in July, 1836.

It also appeared, that lot 95 was taxed to Chesley by the assessors of Poland in 1829, but in 1830 and 1831, it was not on the valuation books. It was also taxed to Chesley in 1832, 1833 and 1834. In 1835, 1836 and 1837, it was not in the valuation, and in 1838, 1839, 1840, 1841 and 1842, the part of the lot levied on was taxed to said *Grosvenor*, and in 1843 and succeeding years, to plaintiffs. It also appeared, that *Chesley* complained of his taxes in 1832, on lot 95, and said it was a wild lot and not worth much, and at the time of the levy, the land was uncultivated. There was no other evidence that *Chesley* had any title to the land at the time of the levy.

The defendants then offered in evidence a collector's deed, of said lot 95, from *Tillson Waterman* to one *Daniel Jackson* dated April 1, 1816, acknowledged Nov. 21, 1845, and recorded Dec. 13, 1848, and testimony to show the validity of said tax title. There was also testimony as to acts of ownership of *Jackson*, of lot 95, soon after he bought it, and that *Chesley* had paid something towards his purchase of it, from *Jackson*. A deed was also put in from said *Daniel Jackson* to *Moses Chesley*, dated and acknowledged March 23, 1840, and recorded Dec. 13, 1848, of lot 95.

The presiding Judge instructed the jury, that they might consider, for the purposes of this trial, that *Jackson* acquired a good title by virtue of the sale of lot 95 to him for taxes, but that the purchase of that title by *Chesley* after the levy, would

not defeat and avoid the levy, and that the plaintiffs' title must be considered good, notwithstanding the deed from *Jackson* to *Chesley* ; and that *Chesley* had no legal right to purchase the title aforesaid, to defeat the title acquired by the levy, even were the title good in the hands of *Jackson*; that the plaintiffs must prove property in the logs, or possession of them, in order to maintain an action of trespass ; that property ordinarily drew the possession to it ; that the trespass must be a joint one, and if they found the logs in question were cut on the land levied on by *Chesley*, after the plaintiff's title accrued, and were attached by *Thayer*, and that subsequently, there was a joint exercise of dominion and control over them by *Thayer* and *Chesley*, before the commencement of this suit, their verdict should be for the plaintiffs.

The jury returned a verdict for the plaintiffs, and the defendants filed exceptions.

*G. F. Shepley*, for defendants.

Plaintiffs claim title under a deed from Godfrey Grosvenor, dated October 12, 1842, which is a deed of warranty of the land levied upon on an execution, *Grosvenor* v. *Chesley*. Grosvenor derived title, if at all, only by virtue of this levy.

At the time of this levy, Chesley had no title to the property, as the defendants contend. *Grosvenor therefore took nothing by his levy.* The plaintiffs took nothing by their conveyance from Grosvenor, who had nothing to convey.

At the time of the levy the title was in Jackson. The jury were instructed, " that they might consider, for the purposes of this trial, that Jackson acquired a good title by virtue of the sale of lot 95 to him, for taxes."

For the purposes of this hearing, it is unnecessary to examine the title of Jackson. That is to be taken as good for the purposes of this hearing, under the instructions of the Court.

Jackson's title was, *subsequently to the levy*, to wit, March 23, 1840, conveyed to Moses Chesley.

The Court instructed the jury, " that the purchase of that title by Chesley, after the levy, would not defeat and avoid the levy, and that the plaintiffs' title must be considered good, not-

withstanding the deed from Jackson to Chesley, and that Chesley had no legal right to purchase the title aforesaid, even if it were good, in the hands of Jackson, to defeat the title acquired by the levy."

The principal questions in the case arise under the foregoing instructions.

Defendants contend, 1st. Where an execution has been extended upon land, as the land of the judgment debtor, he is not estopped thereby from subsequently acquiring an outstanding better title and setting it up against the title claimed under the levy, there being no warranty, express or implied. *Jackson v. Wright*, 14 Johns. 189 ; Co. Litt. section 446, 265 and 266 ; *Davis v. Hayden*, 7 Mass. 257 ; *Blanchard v. Brooks*, 12 Pick. 66 ; *Jackson v. Hubble*, 1 Cowen, 616 ; *Jackson v. Bradford*, 4 Wend. 622 ; *Pelletreau v. Jackson*, 11 Wend. 110 ; *Jackson v. Waldron*, 13 Wend. 178 ; *Baxter v. Bradbury*, 20 Maine, 263 ; *Comstock v. Smith*, 13 Pick. 116.

All the foregoing cases limit the estoppel to the case of a grantor, conveying with covenants of general warranty, and the case of *Comstock v. Smith*, decides, that if the grantor convey with covenants of special warranty, he is not thereby estopped from setting up a subsequently acquired title.

*Woodman*, for plaintiffs.

1. The ruling of the Judge, " that if Jackson acquired a good title by virtue of the sale of lot No. 95, the purchase of that title by Chesley would not defeat the levy," &c., was correct.

Estoppels may be by record, by deed or *en pais*. The estoppel in the present case, partakes of them all perhaps. It is by record. It is virtually a deed ; and it implies a declaration *en pais*, on the part of Chesley, by choosing one appraiser, that he owned the land.

A man shall never be permitted to claim in opposition to his deed, by alleging he had no estate in the lands ; and if a man makes a lease of land, by indenture, which is not his, or levies a fine of an estate not vested, and he afterwards purchases the land, he shall, notwithstanding, be bound by his deed, and not be permitted to aver he had nothing in it. *Jack-*

*son* v. *Bull*, 1 Johns. Cases, 90; *Jackson* v. *Murray*, 12 Johns. 204; *Jackson* v. *Stevens*, 16 Johns. 114; *Flagg* v. *Mann*, 14 Pick. 481; *Ham* v. *Ham*, 14 Maine, 353, 354; *Somes* v. *Skinner*, 3 Pick. 59; *Russel* v. *Coffin*, 8 Pick. 153; *Goodtitle* v. *Morse*, 3 Term Rep. 365.

A man may not only be estopped by his warranty, but he may be estopped by his conveyance without warranty. *Comstock* v. *Smith*, 13 Pick. 120; see also, *Hatch* v. *Kimball*, 16 Maine, 148; *Campbell* v. *Knights*, 24 Maine, 333; *Hurd* v. *Hall*, 16 Pick. 459; *Sayles* v. *Smith*, 12 Wend. 57; *Swan* v. *Saddlemire*, 8 Wend. 676; *Varney* v. *Stevens*, 22 Maine, 331, 334.

Whatever may be the doctrine as to estoppels by quitclaims, or a conveyance by release, it has been settled in Massachusetts, and recognized in Maine, that the statute conveyance by levy of an execution, operates as an estoppel, forever preventing the debtor from claiming the land. *Varnum* v. *Abbott*, 12 Mass. 476; *Ham* v. *Ham*, 14 Maine, 354; *Fairbanks* v. *Williamson*, 7 Greenl. 101; *Bryant* v. *Tucker*, 19 Maine, 383; *O'Neal* v. *Duncan*, 4 McCord, 248.

For this there is good reason. The debtor virtually agrees, being a party to the conveyance, that the creditor shall have the land for his debt, especially where he chooses an appraiser as in this case.

The debtor and creditor shall be estopped in such a case for the same reason as by covenant of warranty, to prevent circuity of action.

A reason why in certain cases, mere releases and quitclaims have been held not to amount to an estoppel, is because they do not purport to *convey the land,* but only the *right, title and interest* which the releasor then had, in the land. In such case the releasee, must be satisfied with the interest for which he stipulated, but not where the conveyances purport *to convey the land* itself. In the present case, the conveyance by Chesley purports to convey the land itself. So Chesley is estopped from claiming it against Grosvenor and his assigns.

2. But Jackson was never seized of the land at all. He

never went into possession. He never went on the land but once, in the summer of 1816. By this he could not gain a seizin by disseizin.

3. As this was wild and uncultivated land, and there could be no tenant of such land for hire, because the temporary use was worth nothing, as the land was taxed to Chesley, in 1829, 1832, 1833 and 1834; as Daniel Jackson then lived in Poland, the presumption arises that Chesley was the owner of the land. He appears to have been seized in fee. How long he had held it does not appear. But Jackson never went on the land after the summer of 1816.

Chesley may have been the original proprietor of the soil. He may have bought under a subsequent sale for taxes. At any rate, it does not appear that Jackson was seized when he conveyed to Chesley in 1841 or 1842, or that he ever had been before, certainly not within 20 years. On the contrary, it appears that Grosvenor and the plaintiffs were seized under the levy. Jackson's deed to Chesley conveyed nothing, and Chesley does not rebut the presumption that he was the true owner at the time of the levy.

4. The deed from Waterman to Jackson conveyed nothing; the requirements of the law were not complied with.

"If a man suffer a great length of time to elapse without asserting the claim, which he at last makes, a presumption arises, either that no real claim ever existed, or that, if it ever did exist, it has since been satisfied, because in the usual course of human affairs, it is not usual to allow real and well founded claims to lie dormant. So the uninterrupted enjoyment of property or privileges for a great length of time, raises a presumption of a legal right." 1 Stark. Ev. part 1, § 15, pp. 33 and 34.

No presumption from lapse of time, could in any event have arisen, that all was rightly done, because whatever we may say of the possession of Chesley, the levy reaches back by relation to the 15th of June, 1835, the time of the original attachment, which was less than 20 years after Waterman's deed to Jackson.

Jackson undoubtedly made inquiry of some attorney at the time, and ascertained that the sale was not good, and abandoned it, and no presumption can now, after the lapse of 32 years, be made in his favor.

It was unlawful for Chesley to buy up this old stale claim, and it cannot operate in his favor, even if Chesley would not be estopped by the levy.

HOWARD, J. — The title to the premises, from which the mill logs in controversy were taken, was contested at the trial. The plaintiffs claimed it, as grantees of Grosvenor, whose title was acquired by attachment and levy of execution upon the land, as the property of Chesley, one of the defendants, in 1836. The defendants contended, that one Jackson acquired the title in 1816, at a sale for taxes, and by a collector's deed ; and that Chesley, under whom the other defendant justified, purchased this title from Jackson in 1840, and took conveyance by deed of warranty.

The presiding Judge instructed the jury, " that they might consider, for the purposes of the trial, that Jackson acquired a good title, by virtue of the sale of the lot for taxes, but that the purchase of that title by Chesley, after the levy, would not defeat and avoid the levy ; and the plaintiff's title must be considered good, notwithstanding the deed from Jackson to Chesley ; and that Chesley had no legal right to purchase the title, even if it were good in the hands of Jackson, to defeat the title acquired by the levy.

The exceptions were urged upon these instructions, and waived as to other rulings and directions of the presiding Judge.

If the title of Jackson were good, as assumed in the instructions to the jury, then Chesley was without title at the time of the attachment and levy, and nothing would pass to Grosvenor by such levy. It was inoperative and void ; and would not estop the creditor from reviewing his judgment ; nor would it estop the debtor, for the estoppel must be reciprocal and mutual.

All interest then in the debtor, which could be reached by the levy, would pass as effectually by such levy, as by his deed. But, as presented, the case finds that he had no title to the premises when the levy upon them was effected. Therefore, by purchasing in the title, subsequent to the levy, Chesley did not violate any covenant, contradict any declaration or act, or impair the effect of any record, upon which his creditor could have properly relied to acquire, or protect any rights; and he would not be estopped to assert this title, upon any settled principle of estoppel.

It does not appear to be necessary, for the purposes of justice, to extend the doctrine of estoppel beyond its established rules and principles.            *Exceptions sustained.*